# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KEENAN L. MCCOY, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 12-1211-JAR-JPO |
| CITY OF INDEPENDENCE, KANSAS, and CLARENCE SNYDER, | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

On March 23, 2011, Plaintiff Keenan L. McCoy was driving with his fifteen-year old stepson when he was stopped by Officer Clarence Snyder of the Independence, Kansas Police Department. Snyder and three other backup officers ordered the men out of their vehicle with guns drawn and handcuffed them before the officers realized that McCoy and his son were not in fact the suspects in an assault that the officers had been investigating. McCoy filed this case alleging racial profiling by Officer Clarence Snyder.[1]

Before the Court is Defendants' Motion for Summary Judgment (Doc. 46) and Plaintiff's Motion for Hearing (Doc. 55) on the summary judgment motion. The summary judgment motion is fully briefed, and the Court is prepared to rule. While this is a case where race appears to be the only suspect identifier that matched McCoy or his stepson, it is not a case that involves

---

[1]The Court previously dismissed Kenneth Parker, Chief of Police, and the claims associated with another incident involving Plaintiff on April 19, 2011 (Doc. 26). Plaintiff represents that these claims, as well as the claims against the City, were included in the Pretrial Order merely to preserve them for appeal. Doc. 54 at 3 n.1. Plaintiff represents that the only remaining claim in this case is an equal protection claim against Defendant Snyder in his individual capacity and the Court confines its analysis to this claim.

a pattern of stopping all or even anyone else based solely on the fact that their race matched the race of the suspect. Thus, while a stop of one person based solely on race as a suspect identifier, particularly when other identifiers did not match, may be strong circumstantial evidence of a Fourth Amendment violation, it is not alone sufficient circumstantial evidence of discriminatory intent or effect on a racial profiling claim. Accordingly, Defendants' motion for summary judgment is granted. The Court does not believe that oral argument would materially assist it in deciding the issues presented on summary judgment, so the motion for hearing is denied.

**I.     Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law."[2] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[4] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5] An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[6]

---

[2] Fed. R. Civ. P. 56(a).

[3] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[4] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9] The nonmoving party may not simply rest upon her pleadings to satisfy her burden.[10] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[12] Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[13] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations

---

[7] *Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[8] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[9] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[10] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[11] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[12] *Adams*, 233 F.3d at 1246.

[13] Fed. R. Civ. P. 56(c)(4).

unsupported by specific facts, or speculation.[14]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[16]

## II. Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or taken in the light most favorable to Plaintiff. At approximately 8:15 p.m. on March 23, 2011, Independence Police Officers Christina Johnson, Andrew Reid, Clarence Snyder, and Lt. Lisa Helkenberg responded to a reported disturbance at a Jiffy Mart on Main Street in Independence, Kansas. When Officer Johnson arrived, she saw two black males in the parking lot, one of whom identified himself as Anthony Sterling. He reported that he had been assaulted by two men, and that he knew the initials, J.B., of one of the men who had assaulted him. When Officer Reid asked Sterling whether he wanted to press charges, Sterling replied that he did not and that he would "take care of it on the streets." Officer Snyder was at the Jiffy Mart for approximately ten minutes and had an opportunity to observe Sterling. Sterling was 31 years old; he was 5 feet 8 inches and weighed 155 pounds. Officer Snyder describes Sterling as a short and stocky black male with dreadlocks that did not extend past his shoulders. None of the officers saw a gun on Sterling.

---

[14]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[15]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[16]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

4

Approximately one-half hour after leaving the Jiffy Mart call, officers were dispatched to a fight on North 17th Street; Snyder responded in case the dispatched officers required assistance. This was J.B.'s residence. Officer Snyder learned that a black male subject named Anthony "Pig" Sterling had been at the residence and was threatening to shoot people there; Officer Snyder recognized Sterling's name from the earlier Jiffy Mart encounter. One of the witnesses reported a bulge in Sterling's shirt. Another witness told officers that Sterling was driving a blue Caprice automobile; another witness told officers that Sterling's car was a 1993 red Mercury, older model, with 24-inch rims. While at the 17th Street residence, a car drove by and one of the residents said "that's the car that Pig was in." Officer Snyder followed after the car and performed a "felony stop" along with Officer Reid. Officers Snyder and Reid removed at least four people from the vehicle—two white males and two black females. Sterling was not in the vehicle, so the officers explained to the occupants why they had been stopped and released them to leave.

According to Officer Snyder, a felony car stop is to be performed if an officer believes there is a dangerous person in a vehicle that could cause injury to officers or the public. The officers' protocol for a felony stop includes using their vehicle for safety, drawing their weapon, and directing the vehicle's occupants out of the car one at a time, secured by a cover officer until all occupants are out of the vehicle and secure.

Officer Snyder returned to patrol and looked for Sterling. The parties dispute whether Snyder had a vehicle description for Sterling's vehicle, but agree that Snyder did not stop Plaintiff's vehicle based on any vehicle description.

Just after 9:00 p.m., Plaintiff and his fifteen year-old stepson, I.K., were driving east in a

1988 gold Cadillac on Myrtle Street, on their way to rent a Redbox video. At a traffic light at 10th Street, Plaintiff noticed a police cruiser driven by Officer Snyder headed south on 10th Street, which turned right to head west on Myrtle. Officer Snyder testified that when he observed Plaintiff's vehicle as he passed by it, he believed the person in the passenger seat was Sterling. Snyder made an abrupt U-turn on Myrtle and got behind Plaintiff's vehicle, turned on his emergency lights, and performed a traffic stop. Officer Snyder called for backup, advising dispatch that he thought he had the subject they were looking for. In the meantime, Snyder instructed Plaintiff to turn off his car and Plaintiff complied. Officer Reid arrived within about two minutes, followed by a third and fourth patrol car, driven by Officer Johnson and Lt. Helkenberg.

After Reid arrived, Officer Snyder got out of his patrol car and stood behind the driver's door. Plaintiff followed Officer Snyder's directive to take off his seat belt and open his door with his right hand. Officer Snyder then instructed Plaintiff to face away from the officers, place his hands behind his back and walk backwards toward the sound of his voice. Officer Johnson approached Plaintiff from Officer Snyder's left side, with his firearm drawn. Officer Snyder's service weapon was trained on Plaintiff. Plaintiff noticed that I.K. was shaking with fear.

Officer Johnson approached Plaintiff and patted him down for weapons. Plaintiff was upset and asked what this was about. Johnson told Plaintiff that they were "looking for someone." Officer Snyder next instructed I.K. to get out of the car in the same manner in which Plaintiff was directed out of the car. I.K. was a fifteen-year-old black male wearing a white T-shirt and gray sweats; he was about six feet tall and weighed 280 pounds. I.K's hair was worn in an afro that extended at least five inches away from his head. By the time Lt. Helkenberg

6

arrived at the scene, Officers Snyder and Reid were both pointing their firearms at Plaintiff and I.K.; Reid was pointing a shotgun. Lt. Helkenberg told the officers that I.K. was not Sterling. Another officer commented, "that is not even them." Officer Johnson released Plaintiff and before Officer Snyder could tell them they were free to go, Plaintiff became angry, yelling expletives and repeatedly asking Officer Snyder for his name. Eventually, Plaintiff and I.K. left the scene.

The Independence Police Department ("IPD") never did obtain an arrest warrant for Sterling—the person who was assaulted failed to cooperate. The officers did not look for Sterling or stop any other vehicles that evening in pursuit of Sterling after they stopped Plaintiff's vehicle. There were never any charges filed against Sterling.

Plaintiff filed a complaint with the Kansas Human Rights Commission ("KHRC") on April 25, 2011, claiming that he and his son had been victims of racial profiling in conjunction with the March 25, 2011 incident, as well as two other interactions Plaintiff had with IPD that are not the subject of the remaining claim in this case.

The video of this stop was recorded on Johnson's patrol car that evening but there is a fifteen second audio gap. The video is no longer maintained by the IPD and Lt. Helkenberg does not know what happened to the recording. Plaintiff obtained a copy for this litigation from the KHRC.

The IPD has a policy prohibiting racial profiling. That policy provides as follows:

> It is the policy of the Independence Police Department to treat all persons having contact with this agency in a fair, equitable, and objective manner, in accordance with law, and without consideration of their race, ethnicity, national origin, gender, religious dress or other individual characteristics.

7

> … .
>
> "Racial Profiling" means the practice of a law enforcement officer or agency relying, as the sole factor, on race, ethnicity, national origin, gender or religious dress in selecting which individuals to subject to routine investigatory activities, or in deciding upon the scope and substance of law enforcement activity following the initial routine investigatory activity. Racial profiling does not include reliance on such criteria in combination with other identifying factors when the law enforcement officer or agency is seeking to apprehend a specific suspect whose race, ethnicity, national origin, gender or religious dress is part of the description of the suspect.[17]

On February 24, 2011, Snyder and other IPD officers attended a two-hour training course on racial profiling provided by the KHRC. Snyder does not remember anything about this training, but understands racial profiling to mean that "you cannot enforce the laws against any one race, color, religion strictly based on that race, color, or religion." Snyder's supervisor, Lt. Helkenberg recalls that the training was boring, but understands that it might not be boring for black citizens. She understands racial profiling is the use of race, gender, any of the protected persons as the sole basis for the consensual or nonconsensual investigation, stop, frisk or search of persons.

## III. Discussion

The City and Snyder move for summary judgment on the remaining claim in this case—racial profiling claim against Officer Snyder in his individual capacity.[18] Defendants argue that Plaintiff cannot demonstrate a constitutional violation and that Snyder is entitled to qualified

---

[17]Doc. 48, Ex. 9 at 1–2.

[18]Defendants also moved for summary judgment to the extent Plaintiff asserted a claim for excessive force. Judge O'Hara denied Plaintiff's motion to amend to add a claim for excessive force after the summary judgment motion was filed, so the Court need not address this claim. *See* Doc. 53.

8

immunity.

Defendant Snyder contends that he is entitled to qualified immunity on Plaintiff's racial profiling claim. When a qualified immunity defense has been raised on summary judgment, the plaintiff must demonstrate that (1) the defendant's actions violated a constitutional or statutory right, and (2) the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue and under the circumstances in question.[19] The court may decide the appropriate order to consider these issues.[20] If plaintiff makes this showing then the burden shifts back to the defendant to demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.[21] "A qualified immunity defense will not succeed [upon summary judgment] . . . when the facts considered collectively present an incomplete picture of the relevant circumstances."[22]

Qualified immunity protects public officials performing discretionary functions unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."[23] Qualified immunity leaves "ample room for mistaken judgments," protecting "all but the plainly incompetent or those who knowingly violate the law."[24] "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

---

[19]*See Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011), *cert. denied*, 133 S. Ct. 211 (2012).

[20]*Camreta v. Greene*, 131 S. Ct. 2020, 2031–32 (2011).

[21]*Id.*

[22]*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002) (internal quotation omitted).

[23]*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[24]*Malley v. Briggs*, 475 U.S. 335, 341 & 343 (1986).

confronted."[25]

In determining whether the plaintiff has met his burden of establishing a constitutional violation that was clearly established, a court construes the facts in the light most favorable to the plaintiff as the non-moving party.[26] "[T]his usually means adopting . . . the plaintiff's version of the facts," unless that version "is so utterly discredited by the record that no reasonable jury could have believed him."[27] The Court has reviewed the videotape recording submitted by the parties and finds that it does not blatantly contradict Plaintiff's version of the events surrounding the traffic stop on March 23, 2011.[28]

Plaintiff alleges a racial profiling claim against Snyder, based on his decision to conduct a felony stop of Plaintiff's vehicle on March 23, 2011. Such an equal protection claim requires Plaintiff to show clear evidence that Snyder's actions "had a discriminatory effect and were motivated by a discriminatory purpose"[29] in order to overcome the presumption that law enforcement conduct did not violate equal protection.[30] While the discriminatory purpose need not be the only purpose, it must be a motivating factor in the decision.[31] "Discriminatory purpose can be shown by demonstrating that the 'decisionmaker . . . selected or reaffirmed a

---

[25]*Saucier v. Katz*, 533 U.S. 194, 202 (2001).

[26]*Scott v. Harris*, 550 U.S. 372, 378–80 (2007); *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (noting that the Tenth Circuit "accept[s] the facts as the plaintiff alleges them").

[27]*Scott*, 550 U.S. at 378, 380. In *Scott*, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of events. *Id*. at 379.

[28]Doc. 48, Exs. L, M.

[29]*Marshall v. Columbia Lea Reg. Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003).

[30]*Id.*; *see also United States v. Armstrong*, 517 U.S. 456, 465 (1996).

[31]*Marshall*, 345 F.3d at 1168.

particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'"[32] Here, Plaintiff does not rely on statistical evidence to show discriminatory purpose. Instead, he relies on the actions of a particular officer during a single incident. In this context, the Court should consider Snyder's "pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances [to] support an inference of discriminatory purpose.[33]

Plaintiff points to the following facts regarding Snyder's discriminatory purpose: (1) the decision to stop was not based on a traffic violation; (2) Plaintiff's car did not match the description of the car Sterling was reportedly driving; (3) Plaintiff did not match the description of Sterling; and (4) I.K. did not resemble Sterling.

It is uncontroverted that Snyder did not stop Plaintiff's vehicle because of a traffic violation, or based on a vehicle description. When Snyder passed by Plaintiff's vehicle on Myrtle Street, he briefly glimpsed at the occupants. He testified at his deposition that he believed Sterling was sitting in the passenger seat of the vehicle. This belief was based on his personal observation of Sterling earlier that evening for approximately ten minutes. Snyder explains the mistaken identification by noting that I.K. was seated in the vehicle, so physical characteristics like height and weight were difficult to discern. Viewing the facts in the light most favorable to Plaintiff, other glaring disparities in these individuals' resemblance should have been readily apparent to Snyder: I.K. did not have dreadlocks, but an afro that extended

---

[32]*Farm Labor Organizing Comm. v. Ohio St. Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002) (quoting *Wayte v. United States*, 470 U.S. 608, 610 (1985)).

[33]*Marshall*, 345 F.3d at at 1168–69; *McNeal v. Losee*, No. 08-2472, 2009 WL 1580274, at*6 (D. Kan. June 3, 2009)

five inches from his head; and, importantly; I.K. weighed over 100 pounds more than Sterling; the men are approximately fifteen years apart in age. Viewing the evidence in the light most favorable to Plaintiff, race was the primary basis for stopping Plaintiff's vehicle.

But the Court is unable to conclude that stopping Plaintiff's car on the race based suspect identifier, standing alone, constitutes clear evidence of discriminatory purpose under *Marshall*. Unlike other cases in which discriminatory purpose is found, the police in this case did not perform a pretextual stop of Plaintiff's vehicle based on race—race was one accurate criteria that described Sterling's appearance, albeit the only criteria that matched Plaintiff and I.K's appearance.[34] While the Court recognizes that circumstantial evidence alone can support a finding of discriminatory purpose,[35] there is no evidence, circumstantial or otherwise, in the summary judgment record that Snyder was motivated even in part by discriminatory animus when he conducted the felony stop.[36] There is no statistical evidence, no pattern of discriminatory behavior, and no evidence of questions or statements by him that would lead a reasonable person to believe that he pulled Plaintiff's vehicle over with the intent to discriminate.[37] Race was one part of Sterling's description that Snyder used in attempting to locate Sterling on March 23, 2011. The fact that no suspect criteria other than race accurately matched Plaintiff or I.K. may be highly relevant to a Fourth Amendment analysis—whether

---

[34]*See, e.g.*, *Marshall*, 345 F.3d at 1168–69; *Giron v. City of Alexander*, 693 F. Supp. 2d 904, 938–39 (E.D. Ark. 2010) (finding direct evidence of discriminatory purpose in case alleging racial profiling of Hispanic motorists).

[35]*Blackwell v. Strain*, 496 F. App'x 836, 844 (10th Cir. 2012).

[36]*See Starr v. Downs*, 271 F. App'x 746, 749 (10th Cir. 2008) ("Some further circumstantial evidence is required other than the fact that [Plaintiff] was an African-American who was followed by [the officer].") (citing *United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001)).

[37]*See Marshall*, 345 F.3d at 1168–69.

there was probable cause to stop the vehicle—but it stops short of clear evidence of discriminatory intent.[38] Plaintiff does not assert a claim that the stop was unreasonable under the Fourth Amendment.

Plaintiff also falls short of showing a genuine issue of material fact as to discriminatory effect. The Tenth Circuit has indicated that a plaintiff can demonstrate discriminatory effect either by showing a similarly situated non-protected individual was treated more favorably, or by relying on statistical evidence.[39] Here, Plaintiff neither comes forward with statistical evidence nor with evidence of a more favorably treated similarly situated individual in support of his claim. IPD officers conducted another felony stop that evening of a vehicle with two white males and two black females, but it is uncontroverted that the first stop was based on a positive vehicle identification by a witness, not on a faulty identification by Snyder. And presumably, Officer Snyder would not have conducted a felony stop in this case of a white male given Sterling's description. Plaintiff argues that the Court should rely on the fact that Defendant only stopped his car that night in pursuit of Sterling. But this actually cuts against Plaintiff's claim of discriminatory effect because it acknowledges that the stop was an isolated example of Snyder's misidentification. The Court is unable to find clear evidence in the record that would create a genuine issue of material fact as to discriminatory effect. Because there is no genuine issue of

---

[38]*See Brown v. City of Oneonta, N.Y.*, 235 F.3d 769, 776–77 (2d Cir. 2000) (denying rehearing en banc on racial profiling claim that race-based suspect identifier violated equal protection and explaining that the Fourth Amendment prohibits arrests and investigatory detentions that are based on race alone); *Washington v. Lambert*, 98 F.3d 1181, 1190–93 (9th Cir. 1996) (affirming directed verdict for plaintiff on Fourth Amendment civil rights claim where dissimilarity of features other than race between plaintiff and suspect did not amount to probable cause); *see also United States v. Lawes*, 292 F.3d 123, 127 (2d Cir. 2002) (evaluating whether dissimilarity between suspect and defendant was fatal to reasonableness of police officers' suspicion).

[39]*Marshall*, 345 F.3d at 1168-69.

material fact about whether Officer Snyder committed a constitutional violation, he is entitled to qualified immunity.[40]

In his response brief, Plaintiff raises the issue of the fifteen-second gap in the audio of the traffic stop recording, and appears to request an adverse inference instruction.[41] To the extent Plaintiff requests such an instruction, it is moot in light of the Court's ruling that Defendant enjoys qualified immunity from suit on this racial profiling claim.

In conclusion, the Court finds that while the incident involving Plaintiff and I.K. was unfortunate, and certainly an avoidable mistake by the officers involved, the evidence is insufficient to create a genuine issue of material fact that a Fourteenth Amendment equal protection violation occurred here. The proper judicial remedy under these circumstances was a claim that the officers violated the Fourth Amendment by stopping and seizing Plaintiff without probable cause that he or I.K. was, in fact, Sterling. But this claim was not asserted, and under the standards that apply to the claim that Plaintiff did raise, summary judgment is appropriate in favor of Defendant Snyder.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (Doc. 46) is **granted**.

---

[40]To the extent Plaintiff continues to allege an official capacity claim against the City, it too would fail. A local government cannot be held liable under § 1983 for acts of its employees; a plaintiff must establish that the municipality has a policy or custom that directly caused the constitutional deprivation of rights. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978). The claim would fail because Plaintiff cannot show an underlying constitutional violation and because Plaintiff did not make any showing that a policy or custom directly caused Snyder's actions in this case.

[41]Plaintiff quotes from *McCue v. Kansas*, 938 F. Supp. 718 (D. Kan. 1996), where Judge Saffels discussed when the adverse inference instruction might be appropriate. Tenth Circuit law provides that such an instruction to the jury requires evidence of intentional destruction. *See Henning v. Union Pac. R.R.*, 530 F.3d 1206, 1220 (10th Cir. 2008). Plaintiff makes no such showing in this case.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Hearing (Doc. 55) is **denied**.

**IT IS SO ORDERED**.

Dated: August 26, 2013

                                                S/ Julie A. Robinson

                                                JULIE A. ROBINSON

                                                UNITED STATES DISTRICT JUDGE